DEBOER TRANSPORTATION, INC.,
Plaintiff-Appellant,

v.

Charles SWENSON,
Defendant-Respondent-Petitioner,

LABOR AND INDUSTRY REVIEW COMMISSION,
Defendant-Respondent.

Supreme Court

*No. 2009AP564. Oral argument January 6, 2011.
—Decided July 12, 2011.*

2011 WI 64

(Also reported in 804 N.W.2d 658.)

600

602

For the defendant-respondent-petitioner there were briefs and oral argument by *John R. Jokela, John Jokela Law Firm LLC,* Wausau.

For the Plaintiff-Appellant there were briefs and oral argument by *Michael J. Lauterbach, Nash Law Group Attorneys at Law, S.C.,* Wisconsin Rapids.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a published opinion of the court of appeals[1] reversing the circuit court's order[2] affirming the Labor and Industry Review Commission's (LIRC) opinion and order requiring deBoer Transportation (deBoer) to pay Charles Swenson (Swenson) $36,193.66 in back pay for deBoer's unreasonable refusal to rehire Swenson following Swenson's work-related injury. The issue presented to this court is whether, under Wisconsin's worker's compensation statute, Wis. Stat. § 102.35(3) (2009–10),[3] deBoer refused to rehire Swenson without

---

[1] *deBoer Transp., Inc. v. Swenson,* 2010 WI App 54, 324 Wis. 2d 485, 781 N.W.2d 709.

[2] The Honorable Edward F. Zappen, Jr. of Wood County presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

reasonable cause. Specifically, we must determine whether, in reaching its conclusion that deBoer failed to show reasonable cause for its refusal to rehire Swenson, LIRC applied an unreasonable interpretation of § 102.35(3), or based its conclusion on findings of fact that were not supported by credible and substantial evidence in the record.

¶ 2. We hold that in reaching its conclusion that deBoer failed to show reasonable cause, LIRC applied an unreasonable interpretation of Wis. Stat. § 102.35(3). LIRC concluded that deBoer did not show reasonable cause because deBoer failed to adequately explain why it would be an unreasonable burden to change its check-ride policy so that Swenson could meet his personal care obligations. Section 102.35(3), however, does not require an employer to change its legitimate and long-standing safety policies in order to assist an employee in meeting personal obligations. Therefore, by adding this require-ment into the statute, LIRC contravened the words of the statute.

¶ 3. Additionally, we hold that LIRC's conclusion that deBoer failed to show reasonable cause based on LIRC's finding that the check-ride policy was pretext, was not supported by credible and substantial evidence.

¶ 4. Accordingly, we affirm the decision of the court of appeals that remanded for dismissal of Swenson's claim against deBoer.

## I. BACKGROUND

### A. Facts

¶ 5. Many of the relevant facts are based on the findings of the Administrative Law Judge (ALJ) adopted by LIRC. However, because this case requires

us to review whether LIRC's findings of facts are supported by credible and substantial evidence, we review the record independently. When we derive material facts from sources other than the ALJ's decision, we so note.

¶ 6. Wausau Carriers, a trucking company, hired Swenson as a truck driver in 2003. Swenson drove a commercial motor vehicle, i.e., a semi-truck with a sleeping area. Swenson drove a "daily" or "local" route, leaving around midnight and returning at 10 a.m. This route allowed him to be home during the day.

¶ 7. Driving a route that allowed Swenson to be home during the day was convenient for Swenson because he was the primary caregiver for his terminally ill father. Swenson was able to care for his father during the day and, therefore, did not need to hire a daytime nurse. However, because Swenson's father needed around-the-clock assistance, a state-provided nurse cared for him at night when Swenson was working.

¶ 8. On August 1, 2005, deBoer took over Wausau Carriers. DeBoer retained Swenson as an employee, and Swenson continued to drive the same route. Shortly thereafter, on August 23, 2005, Swenson sustained a work-related injury to his left knee.[4] As a result of the injury, Swenson was unable to work until January 22, 2006. During the time he was unable to work, Swenson received worker's compensation benefits.

¶ 9. Initially upon returning to work, Swenson worked in deBoer's office. His doctors cleared him to return to his regular duties on February 27, 2006. When deBoer learned from the worker's compensation adjuster that Swenson was cleared to return to his regular duties, Cindy Vogel (Vogel), deBoer's worker's compen-

---

[4] The parties agree the injury was work related.

sation administrator, sent Swenson a letter[5] explaining deBoer's reorientation process for drivers who have been off work, for any reason, for more than two months. Specifically, the letter advised Swenson to: "Please note your Professional Driver work manual, driver[s] off work for more than 2 months are required to complete orientation, complete a minimum of one trip with another driver to regain the skills necessary to safely operate a commercial motor vehicle and pass DOT re-certification tests."

¶ 10. The manual referred to in Vogel's letter contains two provisions relevant to this appeal. First, under the section entitled "Work Related Accidents or Illnesses," and the subsection "Employees returning to work," the manual states that:

> Drivers who are off work for any reason for more than 2 months are required to:
>
> 1. Complete orientation
>
> 2. Complete a minimum of one trip with another driver to regain the necessary skills that were not used while off work.

Second, under the section "Leaves of Absence" and the subsection "Workers' Compensation Leave," the manual states, "Drivers who are [out] of work for any reason for more than 2 months are required to complete orientation and begin as a 2nd seat driver and progress through the regular procedures to regain the necessary skills that were not used while off work."

¶ 11. In addition to referencing the orientation requirements set forth in deBoer's manual, Vogel's letter notified Swenson that arrangements for his re-

---

[5] Facts relating to the letter are taken from Vogel's testimony and the letter itself. Both are part of the record before us.

certification drug-test and classroom orientation had been made for Monday, February 27, and Tuesday, February 28. Swenson complied with deBoer's orientation requirements scheduled for the week of February 27. He took the drug-test and participated in the classroom training. In addition, he completed the road test required by the Department of Transportation (DOT). The DOT road test took approximately 15 minutes and included driving a commercial truck down a highway, turning the truck around, and backing it up.[6] Swenson passed this test.

¶ 12. When Swenson completed the orientation, Dan Garcia (Garcia), deBoer's safety director, contacted Swenson and advised Swenson that pursuant to deBoer's safety policy, Swenson was required to go on an overnight check-ride with a certified driver before returning to work. Swenson was told the check-ride could last anywhere from a few days to weeks. Upon learning that the check-ride would potentially require him to be away from home for an extended time period, Swenson informed Garcia that he would be unable to do the check-ride because he needed to be home daily to care for his ailing father. Swenson requested that Garcia find someone to train him locally or, in the alternative, that deBoer pay for a nurse to care for his father while he was on the check-ride.

¶ 13. DeBoer was unwilling to accede to Swenson's requests. Garcia testified that he was unable to consent to Swenson's first request because none of the drivers currently driving day routes were "driver trainers."[7] He

[6] The details of the DOT road test are taken from Swenson's testimony at the administrative hearing.

[7] Garcia explained what made driver trainers distinct from the typical driver at deBoer: "Those individuals have been

explained that deBoer had already dispatched a driver from out-of-state to come to Wisconsin to take Swenson on his check-ride. DeBoer also refused to cover the expenses of a day nurse to care for Swenson's father while he was away on the check-ride.

¶ 14. Swenson investigated the cost of hiring a daytime nurse to care for his father. Finding daytime assistance too costly, Swenson again refused to complete the check-ride. Following Swenson's refusal to go on the check-ride, deBoer discharged Swenson.

### B. Procedural History

#### a. Administrative hearing and decision

¶ 15. Based on the above circumstances, Swenson sought benefits under Wis. Stat. § 102.35(3)[8] alleging deBoer unreasonably refused to rehire him. On December 29, 2006, he requested an administrative hearing by the Department of Workforce Development, Worker's Compensation Division. A hearing was held before an ALJ.[9]

¶ 16. At the administrative hearing, Garcia acknowledged that the check-ride was not required by the

---

approved by management, and upon approval have been sent to school for five days worth of classes to learn how to not only teach but evaluate a person's skills to see whether or not they are capable of doing this job in a safe manner; [they have] also been trained to communicate back to that person and back to management what they [] saw and of course this is done again to ensure safety."

This testimony, and Garcia's assertion that there were not driver trainers driving local routes, was taken from the administrative hearing transcript. It is uncontroverted.

[8] *See infra* section II.B. for a discussion of Wis. Stat. § 102.35(3).

[9] Judge Mary Lynn Endter was the presiding ALJ.

DOT or any federal regulations. He stated, however, that liability and safety are "[a]bsolutely [the] Number 1 concern" of deBoer. He explained that the check-ride policy is in place to meet these concerns:

> [The] policy is set in place to protect people and the public, we have to make sure that the trucks that we put out there on the road and the drivers we put in those trucks on the road are qualified, safe drivers, and the road test, the brief road test that is done in orientation does not suffice to [do] that, it doesn't give us enough information to know that the driver and the truck is qualified to fully handle the day-in and day-out duties of that job.

Similarly, Vogel explained:

> [T]he whole idea of the skills assessment trip is these people are off for . . . and out of the tractors and off the public highways for a given period of time which can even change seasons, you know, they may get hurt in the summertime, they return when the road changes, do they have these skills, can they get in and out, are they safe, have they recovered to the point where they can operate this vehicle? No, we can't make an exception.

Vogel also testified that in the 25 years she has worked as the worker's compensation coordinator for deBoer, an exception to the check-ride policy had not been granted. She stated that she was unaware of a single driver who was off work for more than 60 days who did not go on a check-ride. Vogel stressed that it was deBoer's intention to rehire Swenson.[10]

¶ 17. Following the May 2007 hearing, the ALJ issued a written decision. After noting that this case

---

[10] The majority of this testimony was taken from the hearing transcript as well as LIRC's dissenting opinion.

was "[i]n many ways [] a tie" and "[i]n baseball, the tie goes to the runner," the ALJ concluded that deBoer unreasonably refused to rehire Swenson and was, therefore, liable to Swenson for a year of lost wages.

¶ 18. First, the ALJ found that Swenson did not quit his employment with deBoer. Rather, Swenson was at all times interested in continuing his employment. Therefore, because Swenson was an employee who was injured in the course of employment and was not rehired, Swenson had met his prima facie case under Wis. Stat. § 102.35(3). The burden then shifted to deBoer to show reasonable cause for its failure to rehire Swenson.

¶ 19. The ALJ acknowledged that under Wisconsin case law an employer is allowed to refuse to rehire an employee for legitimate business reasons. She also acknowledged that the check-ride policy ensured that drivers returning to work were safe which, in the ALJ's words, is "certainly a legitimate concern." Nonetheless, the ALJ concluded that in this case deBoer used its check-ride policy as pretext for its refusal to rehire Swenson: "This was a case where one could infer that deBoer was not interested in keeping Mr. Swenson as an employee and used its policy on check-rides as its reason even though Mr. Swenson had mitigating circumstances."

¶ 20. The ALJ then went on to highlight that deBoer could have changed its check-ride policy so that Swenson could satisfy his personal care obligations:

> Mr. Swenson was not asking deBoer for an exception to the policy requiring [the check-ride]. He was asking if some alternative arrangement could be made for the check-ride. As best as one can tell from the testimony of the two deBoer witnesses, alternatives were not explored. They took a blind approach to this policy and for

611

them that was the end of it. Was that a reasonable approach given Mr. Swenson's circumstances? In short, it was not.

This is not a case where Mr. Swenson had restrictions and deBoer could not provide work to accommodate those restrictions. DeBoer would not be required to make work for Mr. Swenson under the statute. But if an employer can provide suitable work with some accommodations, then why would an employer not attempt to find some accommodation for the type of problem Mr. Swenson was faced with?

Based on the ALJ's findings that the check-ride was pretext and that deBoer could have changed the policy so that Swenson could meet his personal care obligations, the ALJ concluded that deBoer had not met its burden to show that it had reasonable cause for its refusal to rehire Swenson.

### b. LIRC's decision

¶ 21. DeBoer appealed the ALJ's decision to LIRC. LIRC issued a two-paragraph memorandum opinion, in which it agreed with the findings and order of the ALJ. *Swenson v. deBoer Transp., Inc.*, WCD No. 2005–030091 (LIRC Feb. 27, 2008). LIRC began its opinion by stating that it "concurred" with the ALJ's opinion. *Id.* at 2. It then continued:

[T]he employer did not credibly explain how the applicant's fitness to resume over-the-road driving could only have been evaluated by an overnight road trip. If it was night driving the employer was concerned about, it could have required the applicant to have gone out with an observer on a night driving trip, with a return home the following morning. This would have been precisely the type of route the applicant had driven in his pre-injury employment. The employer's

unyielding insistence that there be an extended overnight trip was unexplained and unreasonable.

The simple accommodation the applicant requested for the testing process was reasonable, and it would not have jeopardized any of the employer's safety concerns. The applicant merely asked for an alternative schedule so that he could care for his terminally ill father, but the employer gave no explanation for failing to even consider this request. As noted by the administrative law judge, the employer had the burden of demonstrating reasonable cause for discharging the applicant, but failed to carry that burden. The employer's safety director refused to discuss any possible accommodation with the applicant, resulting in what constituted a discharge.

*Id.* LIRC then concluded that it was reasonable to infer that Swenson's injury played a role in deBoer's refusal to rehire Swenson: "The employer's actions evinced an unreasonable disregard for the applicant's circumstances, leading to the credible inference that the work injury did play a part in the discharge." *Id.*

¶ 22. Commissioner Robert Glaser filed a dissenting opinion. *Id.* at 3. According to Commissioner Glaser, deBoer "unambiguously demonstrated that it acted reasonably [when it refused to rehire Swenson], and that because of the applicant's actions it had good cause not to rehire him." *Id.* Commissioner Glaser underscored that the uncontroverted testimony at the administrative hearing illustrated that the purpose of the check-ride was to ensure the safety of deBoer's drivers and the public. *Id.* at 3–4. Moreover, Swenson was entirely capable of fulfilling the check-ride, as evidenced by the fact that Swenson testified he would go on the check-ride if deBoer would pay for daytime nursing care for his father. *Id.* at 4. Given the uncon-

613

troverted facts adduced at the hearing, Commissioner Glaser concluded, "In this case the *only* credible evidence of record demonstrates that there was no violation of the statute." *Id.* at 5.

### c. Circuit court decision

¶ 23. DeBoer sought circuit court review, naming Swenson and LIRC. DeBoer alleged that LIRC acted without or in excess of its powers when it concluded that deBoer unreasonably refused to rehire Swenson.[11] Specifically, deBoer alleged that LIRC's facts were not supported by the evidence.

¶ 24. After briefings and a hearing on the matter, the circuit court issued an oral ruling affirming LIRC's decision. The circuit court first concluded that based on the record, it cannot be inferred that Swenson was fired because of his knee injury. The circuit court called the inference "preposterous" because there was "no evidence to support it." Nonetheless, the circuit court affirmed LIRC's decision based on deBoer's work manual. The court found the policy nebulous with regard to overnight trips. Because, in the court's opinion, Swenson did everything required by the written policy, the circuit court summarily concluded that it must give deference to LIRC.

### d. Court of appeals decision

¶ 25. DeBoer appealed and the court of appeals, in a published decision, reversed and remanded for dismissal of Swenson's claim. *deBoer Transp., Inc. v. Swenson,* 2010 WI App 54, ¶ 20, 324 Wis. 2d 485, 781 N.W.2d 709. The court of appeals concluded that LIRC's

---

[11] Pl.'s Compl. 1–2.

decision requiring deBoer to demonstrate why accommodating Swenson's personal obligations by changing its check-ride policy would have compromised safety or caused a financial burden on deBoer was erroneous. *Id.*, ¶ 12. According to the court of appeals, this "amounts to an incorrect interpretation of the statute because it requires something more than reasonable cause." *Id.* The court opined that by enacting Wis. Stat. § 102.35(3), the legislature did not intend to "require employers to assess which non-work, non-injury-related requests merit accommodations and which do not" and that it was not unreasonable under § 102.35(3) for deBoer to refuse to adjust to the "non-work, non-injury-related issue in Swenson's life." *Id.*, ¶¶ 15–16.

¶ 26. With regard to pretext, the court of appeals concluded that LIRC's pretext analysis added "nothing to its reasonable cause analysis [because] [t]he commission's sole reason for finding that deBoer's check-ride requirement was a pretext was deBoer's failure to present evidence that it would have been an unreasonable burden to accommodate Swenson in providing care for his father." *Id.*, ¶ 19.

¶ 27. The court of appeals did not decide what level of deference to afford LIRC's decision in this case because LIRC engaged in an unreasonable application of Wis. Stat. § 102.35(3). *Id.*, ¶ 10. According to the court of appeals, "[a]n unreasonable application of a statutory standard will not be upheld under any level of deference."[12] *Id.*

---

[12] Judge Dykman filed a dissenting opinion in which he opined that he would give great weight deference to LIRC, and under this great weight standard, "LIRC was entitled to believe that no useful purpose would be served by requiring Swenson to take an extended overnight trip when his future employment

¶ 28. We granted review and now affirm the court of appeals.[13]

## II. DISCUSSION

### A. Standard of Review

¶ 29. When reviewing a worker's compensation claim, we review LIRC's decision, not the decisions of the circuit court or court of appeals. *Cnty. of Dane v. LIRC,* 2009 WI 9, ¶ 14, 315 Wis. 2d 293, 759 N.W.2d 571. In this case, we are asked to review LIRC's conclusion that deBoer failed to show "reasonable cause" for its refusal to rehire Swenson. Reasonable cause is a mixed question of fact and law. *Ray Hutson Chevrolet, Inc. v. LIRC,* 186 Wis. 2d 118, 122, 519 N.W.2d 713 (Ct. App. 1994).

¶ 30. "LIRC's findings of historic fact must be upheld on review if there is credible and substantial evidence in the record on which reasonable persons could rely to make the same findings." *Begel v. LIRC,* 2001 WI App 134, ¶ 5, 246 Wis. 2d 345, 631 N.W.2d 220; Wis. Stat. § 102.23(6).[14]

---

would have nothing to do with that type of driving." *deBoer,* 324 Wis. 2d 485, ¶ 34.

[13] Of note, LIRC was a party to this case in the circuit court and the court of appeals. However, it did not file a petition for review in this court or participate in our review.

[14] Under Wis. Stat. § 102.23(6):

> If the commission's order or award depends on any fact found by the commission, the court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact. The court may, however, set aside

¶ 31. Once the facts are established, whether they give rise to reasonable cause under Wis. Stat. § 102.35(3) requires us to examine the construction of the statute and its application to the facts. "The construction of a statute and its application to undisputed facts are questions of law that we [] review independently." *Cnty. of Dane,* 315 Wis. 2d 293, ¶ 14; *see also Ray Hutson,* 186 Wis. 2d at 122 ("Once the facts are established, whether they give rise to reasonable cause is a question of law."). However, when reviewing administrative agency decisions, depending on the circumstances, we may give deference to the agency's interpretation of a statute. *Cnty. of Dane,* 315 Wis. 2d 293, ¶ 14.

¶ 32. We employ one of three levels of deference in reviewing an administrative agency's statutory interpretation and application: great weight deference, due weight deference, or de novo review. *Id.*

¶ 33. We afford an agency's interpretation and application of a statute great weight deference if the following four requirements are met:

> (1) the agency was charged by the legislature with the duty of administering the statute; (2) the interpretation of the statute is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute.

---

the commission's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported by credible and substantial evidence.

*Id.,* ¶ 16 (quoting *Clean Wis., Inc. v. Pub. Serv. Comm'n of Wis.,* 2005 WI 93, ¶ 39, 282 Wis. 2d 250, 700 N.W.2d 768) (internal modifications omitted). Under great weight deference, the agency's interpretation and application of a statute must be reasonable. *Id.; Kuhnert v. Advanced Laser Machining, Inc.,* 2011 WI App 23, ¶ 9, 331 Wis. 2d 625, 794 N.W.2d 805. An agency's interpretation "is unreasonable and may be reversed by a reviewing court if it directly contravenes the words of the statute or the federal or state constitution, if it is clearly contrary to the legislative intent, history, or purpose of the statute, or if it is without rational basis." *Brown v. LIRC,* 2003 WI 142, ¶ 19, 267 Wis. 2d 31, 671 N.W.2d 279. As long as the interpretation and application are reasonable, we will uphold an agency decision even if there are other, more reasonable, interpretations. *Cnty. of Dane,* 315 Wis. 2d 293, ¶ 16.

■ ■

¶ 34. We afford an agency's interpretation and application of a statute due weight deference "when 'the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court.' " *Id.,* ¶ 17 (quoting Clean Wis., 282 Wis. 2d 250, ¶ 42); *see also Pick 'n Save Roundy's v. LIRC,* 2010 WI App 130, ¶ 15, 329 Wis. 2d 674, 791 N.W.2d 216 (concluding that LIRC's interpretation and application of a statute were appropriate for great weight deference). When employing due weight deference, we uphold the agency's interpretation and application as long as it is reasonable and another interpretation is not more reasonable. *Cnty. of Dane,* 315 Wis. 2d 293, ¶ 17.

618

¶ 35. Lastly, we afford an agency's interpretation and application of a statute no deference, reviewing it de novo, "when the issue before the agency is clearly one of first impression" or "when an agency's position on an issue has been so inconsistent as to provide no real guidance." *Id.*, ¶ 18 (internal quotation marks and citation omitted). When we review a decision de novo, we engage in our own independent analysis of the statute and its application to the facts, benefitting from the agency and prior court decisions. *State v. Aufderhaar,* 2005 WI 108, ¶ 10, 283 Wis. 2d 336, 700 N.W.2d 4; *Brown,* 267 Wis. 2d 31, ¶ 14.

¶ 36. The parties dispute under which standard we should review LIRC's interpretation and application of Wis. Stat. § 102.35(3) in this case. Swenson argues that we should employ great weight deference, while deBoer contends that we should employ a de novo standard of review. However, we agree with the court of appeals that we need not decide the applicable standard of review here because LIRC's statutory interpretation and application is unreasonable, and therefore, it will not withstand any level of deference. *deBoer,* 324 Wis. 2d 485, ¶ 10. As discussed above, even under the great weight standard of review, an agency's statutory interpretation and application must be reasonable. *Volvo Trucks N. Am. v. DOT,* 2010 WI 15, ¶¶ 11–13, 323 Wis. 2d 294, 779 N.W.2d 423.

B. Wisconsin Stat. § 102.35(3):
Unreasonable Refusal to Rehire

¶ 37. This case requires us to review LIRC's interpretation and application of Wis. Stat. § 102.35(3). The relevant portion of § 102.35(3) provides:

Any employer who without reasonable cause refuses to rehire an employee who is injured in the course of employment, where suitable employment is available within the employee's physical and mental limitations, upon order of the department and in addition to other benefits, has exclusive liability to pay to the employee the wages lost during the period of such refusal, not exceeding one year's wages.

¶ 38. The purpose of Wis. Stat. § 102.35(3) is to protect injured workers. *West Allis Sch. Dist. v. DILHR*, 116 Wis. 2d 410, 422, 342 N.W.2d 415 (1984). As we have explained:

It is clear from the plain words of the statute that its purpose is to prevent discrimination against employees who have previously sustained injuries and to see to it, if there are positions available and the injured employee can do the work, that the injured person goes back to work with his former employer.

*Id.* Section 102.35(3) must be liberally construed to effectuate this purpose. *Id.* at 421–22. In other words, § 102.35(3) "must be liberally construed to afford the aggrieved worker additional compensation." *Id.* at 422.

¶ 39. Wisconsin courts employ a burden-shifting approach when an employee brings a Wis. Stat. § 102.35(3) claim for unreasonable refusal to rehire. Under this approach, the employee must first make a prima facie case of an unreasonable failure to rehire. It is undisputed that as part of the prima facie case, the employee must show that: (1) the claimant was an employee of the employer from which he or she seeks benefits;[15] (2) the claimant was injured in the scope of employment; and (3) subsequent to the injury, the

---

[15] "Employee" is defined in Wis. Stat. § 102.07. *See also West*

employer refused to rehire the employee.[16] *See, e.g., West Bend Co. v. LIRC,* 149 Wis. 2d 110, 123, 438 N.W.2d 823 (1989); *Dielectric Corp. v. LIRC,* 111 Wis. 2d 270, 330 N.W.2d 606 (Ct. App. 1983); *Groh v. Alyson Tool Corp.,* WC No. 2004–002455 (LIRC Nov. 30, 2006); John D. Neal & Joseph Danas, Jr., *Worker's Compensation Handbook* § 8.28–.31 (6th ed. 2010) [hereinafter "Neal, *Worker's Compensation*"].

¶ 40. However, there is a potential inconsistency in the case law with regard to the third element of the prima facie case—that the employer refused to rehire the employee. Some cases require as part of this element, a showing that the employer refused to rehire the employee *because of the work-related injury. See, e.g., Ray Hutson,* 186 Wis. 2d at 122; *Hill v. LIRC,* 184 Wis. 2d 101, 111, 516 N.W.2d 441 (Ct. App. 1994). Other cases, however, do not require the employee to show why the employer refused to rehire the employee, instead requiring only a showing that the employer refused to rehire, without tying the refusal to any particular reason. *West Allis,* 116 Wis. 2d at 424–25; *Dielectric,* 111 Wis. 2d at 278. *See also* Neal, *Worker's Compensation* § 8.32.

¶ 41. The potential inconsistency in the law is best demonstrated by our decision in *West Bend.* In *West Bend,* we set forth the elements of a Wis. Stat. § 102.35(3) prima facie case, twice. In our first expression of the requirement, citing *West Allis* and *Dielectric,*

*Bend Co. v. LIRC,* 149 Wis. 2d 110, 118–119, 438 N.W.2d 823 (1989) (discussing whether the claimant was an "employee" for the purposes of Wis. Stat. § 102.35(3)).

[16] While not at issue here, we note that at least one court has listed as an additional element of the prima facie case that the employee must show that he or she applied for rehire. *Hill v. LIRC,* 184 Wis. 2d 101, 111, 516 N.W.2d 441 (Ct. App. 1994).

we stated that the employee's prima facie case is met "[a]fter an employe[e] shows that she has been injured in the course of employment and subsequently is denied rehire." *West Bend*, 149 Wis. 2d at 123. We did not specify that the employee must show that she was denied rehire because of the injury. However, in our second expression of the requirement, we stated that the last element of the prima facie case is that the employee has "been denied rehiring *because of the injury sustained in her work.*" *Id.* at 126 (emphasis added).

¶ 42. While we take the opportunity to underscore this potential inconsistency in the case law, we save its resolution for another day. Even if we conclude, most favorably to Swenson, that an employee is not required to show that the refusal to rehire was because of the injury, Swenson still is not entitled to back pay because deBoer had reasonable cause not to rehire him. Therefore, deciding whether an employee must prove he or she was denied rehire *because of the injury* is not necessary for the disposition of this case. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed).

¶ 43. Moving on, when the employee brings forth facts that support all the elements of a prima facie case, the burden shifts to the employer to show reasonable cause for its refusal to rehire the claimant. *West Bend*, 149 Wis. 2d at 123; *Ray Hutson,* 186 Wis. 2d at 122. We have defined "reasonable cause" under Wis. Stat. § 102.35(3) to mean that "an employer, if there is suitable employment available, can [] refuse to rehire [only] for a cause or reason that is fair, just, or fit under the circumstances." *West Allis*, 116 Wis. 2d at 426.

¶ 44. An example of when an employer showed there was reasonable cause for its refusal to rehire a

previously injured employee is ably described by the court of appeals decision, *Ray Hutson,* 186 Wis. 2d 118. In *Ray Hutson,* the employee, Tooley, was one of a five-person parts sales staff in Ray Hutson Chevrolet's (Hutson) sales department. *Id.* at 121. Tooley sustained a work-related injury and while he was on leave recuperating from the injury, Hutson realized that it could operate the sales department without Tooley. *Id.* Consequently, when Tooley was ready to return to work, Hutson refused to rehire him as a parts salesperson, and instead offered him a lower paying position in a different department. *Id.* Tooley rejected this offer and brought an unreasonable refusal to rehire claim under Wis. Stat. § 102.35(3). *Id.* Noting that it was uncontroverted that Hutson eliminated Tooley's position to save costs, the court of appeals concluded that Hutson had met its burden to show reasonable cause for its refusal to rehire Tooley. Reasonable cause is shown, the court held, when an employer makes a business decision in order to reduce costs. *Id.* at 123.

¶ 45. Consistent with *Ray Hutson,* and of particular importance here, Wis. Stat. § 102.35(3) does not contain a requirement that employers change their legitimate and universally applied business policies to meet the personal obligations of their employees. We note that there are instances in Wisconsin employment statutes where employers are required to make certain modifications. Particularly, "accommodation" comes into play under Wisconsin's employment discrimination statutes. Specifically, pursuant to Wis. Stat. § 111.34(1)(b), "[e]mployment discrimination because of disability" includes "[r]efusing to reasonably accommodate an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation

623

would pose a hardship on the employer's program, enterprise or business." *See also Crystal Lake Cheese Factory v. LIRC,* 2003 WI 106, 264 Wis. 2d 200, 664 N.W.2d 651 (requiring the employer to accommodate a worker's disability in a case brought under § 111.34(1)(b)). Section 111.34(1)(b) has no application in a refusal to rehire claim under § 102.35(3).

## C. LIRC's decision

¶ 46. We begin by setting out the elements of Swenson's Wis. Stat. § 102.35(3) claim that are not at issue here. With regard to Swenson's prima facie case, Swenson has satisfied all three elements.[17] First, there is no dispute that Swenson was an employee of deBoer. Second, the parties agree that Swenson was injured in the scope of employment. Third, the ALJ made an unchallenged finding of fact that deBoer refused to rehire Swenson, i.e., that Swenson did not quit. Because all the elements of the prima facie case are satisfied, the burden shifts to deBoer to show reasonable cause for its refusal to rehire Swenson. LIRC's conclusion that deBoer did not show reasonable cause for refusing to rehire is at the heart of this case.

¶ 47. As set forth above, the issue in this case is whether LIRC's conclusion that deBoer failed to show reasonable cause for its refusal to rehire Swenson is based on an unreasonable interpretation and applica-

---

[17] As discussed above, there is a potential inconsistency in the case law with regard to the third element of the prima facie case. Namely, it is unclear whether the employee is required to show that the employer refused to rehire him *because of the injury.* We again emphasize that we are not deciding this issue today, and are assuming solely for the sake of this opinion that Swenson was not required to show that the refusal to rehire was due to his work-related injury.

tion of Wis. Stat. § 102.35(3), or whether LIRC's conclusion is dependent on findings of fact that are not supported by credible and substantial evidence in the record. We have identified two rationales on which LIRC's conclusion is grounded. First, LIRC grounds its conclusion on its finding that deBoer did not explain why it couldn't modify its check-ride policy and, thereby, assist Swenson in meeting his personal care obligations. Second, LIRC found that deBoer's strict adherence to its check-ride policy was pretext for its underlying motive, i.e., Swenson's work-related injury, in failing to rehire Swenson.

¶ 48. Taking each in turn, we begin with LIRC's conclusion that deBoer failed to show reasonable cause for its refusal to rehire Swenson because deBoer refused to modify its check-ride policy in order to assist Swenson in meeting his personal care obligations. Notably, LIRC adopted the ALJ's finding that the safety concerns of deBoer that the check-ride policy is meant to address are "certainly [] legitimate." Moreover, nowhere in its opinion did LIRC conclude that requiring Swenson to complete the check-ride was unreasonable. Instead, LIRC concluded that deBoer's failure to explain why it couldn't modify the check-ride so that Swenson could complete it was unreasonable. *Swenson,* WCD No. 2005–030091, at 2. As LIRC stated, "[i]f it was night driving the employer was concerned about, it could have required the applicant to have gone out with an observer on a night driving trip, with a return home the following morning." *Id.*

¶ 49. LIRC went on to more explicitly underscore that it was deBoer's failure to "accommodate" Swenson's personal situation that drove its decision on whether deBoer had reasonable cause to refuse to rehire Swenson. LIRC opined, Swenson "merely asked for an alter-

native schedule so that he could care for his terminally ill father" and that this "*simple accommodation* the applicant requested for the testing process was reasonable, and it would not have jeopardized any of the employer's safety concerns." *Id.* (emphasis added). This language illustrates that LIRC's review was focused on whether deBoer acted reasonably when it chose not to compromise its check-ride policy so that Swenson could meet his personal care obligations. In other words, LIRC reviewed whether deBoer demonstrated reasonable cause for its refusal to adjust to Swenson's personal obligations. By engaging in this type of review, LIRC was requiring deBoer to put forth evidence that it would have been an unreasonable burden to change its check-ride policy so that Swenson could meet his personal care obligations.

 

¶ 50. Under Wis. Stat. § 102.35(3), however, the employer is not required to change valid business protocol to adjust for an injured employee's personal obligations. Under § 102.35(3), the employer must show only that it had "reasonable cause" to refuse to rehire an employee. An employer is not obligated to change its long-standing and legitimate safety policies under the plain language of § 102.35(3) for the sake of assisting an employee to meet his personal obligations.

¶ 51. Therefore, we agree with the court of appeals that requiring deBoer to show the unreasonableness of Swenson's requested modifications to the check-ride policy "amounts to an incorrect interpretation of the statute because it requires something more than reasonable cause" for refusing rehire. *deBoer,* 324 Wis. 2d 485, ¶ 12. Specifically, what LIRC's interpretation of "reasonable cause" under Wis. Stat. § 102.35(3)

required was that deBoer deviate from a long-standing safety policy in order to assist Swenson in a personal matter. It is unreasonable to conclude, from the language of the statute or applicable case law, that when enacting § 102.35(3), the legislature intended to burden employers by mandating that they change legitimate business policies to assist employees with meeting personal obligations. As the court of appeals noted, "it is not reasonable to suppose that the legislature intended to impose on employers the burden of judging which non-work, non-injury-related requests need to be accommodated if reasonably possible." *Id.*, ¶ 15.

¶ 52. Furthermore, although LIRC did not mention ch. 111 of Wisconsin's statutes in its opinion when it required deBoer to "accommodate" Swenson, it appears LIRC was, mistakenly, incorporating the accommodation requirements for employees with disabilities set forth in ch. 111 into Wis. Stat. § 102.35(3). In particular, pursuant to Wis. Stat. § 111.34(1)(b), employment discrimination because of a disability includes: "Refusing to reasonably *accommodate* an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise or business." (Emphasis added.) Under § 111.34(1)(b), employers are required to make reasonable accommodations for employees with disabilities.[18] *See,* e.g., *Crystal Lake,* 264 Wis. 2d 200. A careful reading of LIRC's opinion illus-

---

[18] Notably, Wis. Stat. § 111.34(1)(b) does not require an employer to accommodate an employee's personal obligations, such as child or elder care, rather, it requires the employer to reasonably accommodate the employee's disabilities. We do not intend to imply that it requires accommodations for personal obligations.

trates that LIRC, perhaps subconsciously, erroneously subsumed the § 111.34(1)(b) "accommodation" requirements into § 102.35(3).

¶ 53. In sum, Wis. Stat. § 102.35(3) does not contain "accommodation" requirements like those in Wis. Stat. § 111.34(1)(b). Section 102.35(3) does not require an employer to change its long-standing and universally applied safety policies. Accordingly, LIRC unreasonably interpreted and applied § 102.35(3) when it based its reasonable cause determination on its finding that deBoer failed to explain why it would be unreasonable to change its check-ride policy. As stated above, even under the greatest deference to LIRC's decision, we will reverse an agency's statutory interpretation and application if it is unreasonable. *Cnty. of Dane,* 315 Wis. 2d 293, ¶ 16. Consequently, LIRC's order that deBoer pay Swenson back pay cannot stand on LIRC's "accommodation" rationale.

¶ 54. We now turn to LIRC's pretext rationale for concluding that deBoer failed to show reasonable cause for refusing to rehire Swenson.[19] Pretext is a finding of

---

[19] The court of appeals highlighted that "[t]he law is unclear on whether the question of pretext is subsumed in the reasonable cause analysis or whether, instead, pretext is a separate issue that is addressed only after an employer establishes reasonable cause." *deBoer,* 324 Wis. 2d 485, ¶ 19. In discussing this lack of clarity, the court cited *Ray Hutson Chevrolet, Inc. v. LIRC,* 186 Wis. 2d 118, 123–24, 519 N.W.2d 713 (Ct. App. 1994), in which the court of appeals addressed pretext only after it established that the employer's business decision to reduce costs constituted reasonable cause to refuse to rehire the employee. We think, however, that the correct manner under which to analyze pretext when reviewing a claim for benefits under Wis. Stat. § 102.35(3) is to treat the pretext argument as subsumed

fact. *Ray Hutson,* 186 Wis. 2d at 124. As aforementioned, we must uphold LIRC's findings of fact if "there is credible and substantial evidence in the record on which reasonable persons could rely to make the same findings." *Begel,* 246 Wis. 2d 345, ¶ 5.

¶ 55. LIRC's finding of pretext was grounded in deBoer's failure to explain why, instead of the check-ride, deBoer could not complete a night trip with another driver, returning home in the morning, as well as deBoer's "unyielding insistence that there be an extended overnight trip" and failure to adjust to Swenson's scheduling needs. *Swenson,* WCD No. 2005–030091, at 2. LIRC, therefore, concluded that deBoer's "actions evinced an unreasonable disregard for the applicant's circumstances, leading to the credible inference that the work injury did play a part in the discharge." *Id.* Or, stated more explicitly, that the check-ride was pretext.

¶ 56. We begin by pointing out that a primary reason LIRC found pretext was that deBoer failed to present evidence that it would have been an unreasonable burden to adjust to Swenson's personal obligations. As discussed above, LIRC's focus on deBoer's failure to change its check-ride policy to assist Swenson in meeting his personal obligations was based on an erroneous interpretation of Wis. Stat. § 102.35(3). Consequently, deBoer's failure to present evidence that it would have been an unreasonable burden to change its check-ride

in the reasonable cause analysis. Most significantly, § 102.35(3) refers to "reasonable cause," not "pretext." An employer has the burden to show that it had reasonable cause to refuse to rehire the employee. An employer will fail to meet this burden if it is found that the alleged reason for the discharge was actually pretext for an underlying, unreasonable motivation. Therefore, when analyzing § 102.35(3), pretext usually is not a separate issue.

policy for the sake of Swenson's personal care obliga-
tions cannot be used as a rationale for LIRC's pretext
finding.[20]

¶ 57. Even more, we conclude that there was not
credible and substantial evidence in the record to
support LIRC's finding of pretext. Simply stated, we
agree with Commissioner Glaser that "[t]here is no
credible evidence that the applicant's work injury was a
motive entering into the employer's actions, or that the
employer acted in anything other than good faith." *Id.*
at 3.

¶ 58. First, the evidence adduced at the adminis-
trative hearing established that deBoer mandates the
check-ride for safety reasons. Both Garcia and Vogel
testified that the purpose of the check-ride was to
ensure the safety of the public and the drivers. *See
supra* section II.B.a. The ALJ accepted the policy's
safety rationale, calling it a "legitimate concern" and
cautioning that her order "should not be construed to
find that safety was not a legitimate concern."

¶ 59. In addition, testimony was unrebutted that
check-rides had been required of employees returning
to work for over 20 years and that an exception to the

---

[20] We conclude that LIRC's finding that deBoer did not
explain why it could not change its check-ride policy to assist
Swenson was not supported by substantial and credible evi-
dence. Rather, the evidence shows that deBoer's reasons for not
modifying its check-ride policy were fully explained and uncon-
troverted. Garcia explained why deBoer could not offer the
change Swenson requested. He testified that check-rides must
be completed by "driver trainers" and none of the drivers
running day routes met this qualification. Garcia explained that
"driver trainers" had been approved by management to hold this
position, and had gone through specialized training where they
learned how to instruct and evaluate other drivers. There was
no evidence rebutting this testimony.

policy had never been made. Vogel explained that the policy is in place for safety reasons:

> [T]he whole idea of the skills assessment trip is these people are off for . . . and out of the tractors and off the public highways for a given period of time which can even change seasons, you know, they may get hurt in the summertime, they return when the road changes, do they have these skills, can they get in and out, are they safe, have they recovered to the point where they can operate this vehicle?

¶ 60. Finally, all the evidence shows that, were it not for Swenson's refusal to complete the check-ride, deBoer would have kept him as an employee. For instance, in an effort to rehire Swenson, deBoer reoriented him and dispatched a driver trainer from out-of-state to come to Wisconsin and take Swenson on his check-ride.

¶ 61. Given these uncontroverted facts—the check-ride policy had a legitimate safety rationale, it had been in place over 20 years, no returning driver had ever been exempt from the policy, and deBoer had taken all necessary steps under its reorientation policy to reinstate Swenson—we conclude there is no credible and substantial evidence in the record on which reasonable persons could rely to make a finding of pretext in this case.[21] There is simply no evidence that deBoer failed to rehire Swenson for any reason other than his

---

[21] The dissent argues that LIRC's finding of pretext is supported by the evidence because the record reveals that Swenson did not learn that the check-ride would be multi-day until "the very day that deBoer had scheduled the check-ride to begin." Dissent, ¶¶ 78–84. First, we underscore that both the work manual and letter from Vogel put Swenson on notice that he would have to complete the check-ride. Swenson, not deBoer, was privy to Swenson's caretaking responsibilities. Nothing

refusal to comply with deBoer's legitimate safety policy. Accordingly, LIRC's conclusion that deBoer lacked reasonable cause because the check-ride policy was pretext has no factual support in the record.

¶ 62. In sum, LIRC's opinion depended on an unreasonable interpretation and application of "reasonable cause" in Wis. Stat. § 102.35(3) and a finding of fact that was not supported by credible and substantial evidence in the record. For that reason, we reverse LIRC, and hold that Swenson is not entitled to back pay. We thereby affirm the decision of the court of appeals that remanded the case for dismissal of Swenson's claim.[22]

---

prevented Swenson, when he was first made aware of the check-ride requirement, from inquiring into what the check-ride would entail.

More importantly, however, even if Swenson did not learn that the check-ride would be an overnight trip until the day he was scheduled to leave, the dissent's reliance on this fact is misplaced. The pretext finding was not based on the time at which Swenson was notified of the duration of the check-ride. Rather, the finding of pretext was based on deBoer's failure to consider modifying its check-ride policy so that Swenson would be home during the day to care for his father. We have reviewed the rationale for the pretext finding and see no discussion of the timing to which the dissent refers.

[22] In reaching this conclusion, we do not diminish the importance of Swenson's role in caring for his ailing father. We offer our sincerest appreciation to Swenson, as well as all other Wisconsin citizens, who act as unpaid primary caregivers for elderly and small children who need such care. Nonetheless, despite the extremely sympathetic facts we are presented with today, and our admiration for Swenson's commitment to his father, we are unable to rewrite Wis. Stat. § 102.35(3) or pretend additional evidence was presented to support the pretext finding. Statutory changes are for the legislature, not this court. *See Interior Woodwork Co. v. Jahn,* 163 Wis. 193, 195, 157 N.W. 772 (1916) ("This court has no right or power to amend the statutes.").

## III. CONCLUSION

¶ 63. We hold that in reaching its conclusion that deBoer failed to show reasonable cause, LIRC applied an unreasonable interpretation of Wis. Stat. § 102.35(3). LIRC concluded that deBoer did not show reasonable cause because deBoer failed to adequately explain why it would be an unreasonable burden to change its check-ride policy so that Swenson could meet his personal care obligations. Section 102.35(3), however, does not require an employer to change its legitimate and long-standing safety policies in order to assist an employee in meeting personal obligations. Therefore, by adding this requirement into the statute, LIRC unreasonably interpreted and applied the words chosen by the legislature.

¶ 64. Additionally, we hold that LIRC's conclusion that deBoer failed to show reasonable cause based on LIRC's finding that the check-ride policy was pretext, was not supported by credible and substantial evidence.

¶ 65. Accordingly, we affirm the decision of the court of appeals that remanded for dismissal of Swenson's claim against deBoer.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 66. ANN WALSH BRADLEY, J. (*dissenting*). The resolution of this case should be a simple matter. The Labor and Industry Review Commission (LIRC) made a finding of fact that deBoer's asserted reason for refusing to rehire Swenson was pretextual. The issue presented by this case is whether there is substantial and credible evidence in the record that supports this finding of pretext.

¶ 67. When reviewing an agency's finding of fact, an appellate court is supposed to search the record for

reasons to uphold it. Rather than searching for reasons to uphold the agency's finding of fact, the majority scours LIRC's decision, searching for reasons to reverse it. It goes through elaborate gymnastics to undermine the agency's finding of fact and ultimate conclusion. Because I conclude that there is substantial and credible evidence to support LIRC's finding of fact— evidence that the majority either glosses over or ignores—I respectfully dissent.

I

¶ 68. The majority acknowledges that deBoer has the burden to show reasonable cause for its refusal to rehire Swenson, and that reasonable cause is defined as a reason that is fair, just, or fit under the circumstances. Majority op., ¶ 43. It agrees that LIRC made a finding of fact that deBoer's asserted business reason for refusing to rehire Swenson was pretextual. *Id.*, ¶ 54. It recognizes that LIRC's findings of fact must be upheld on review if there is substantial and credible evidence in the record on which reasonable persons could rely to make the same findings. *Id.*, ¶ 30.

¶ 69. Nevertheless, the majority does not squarely address LIRC's finding of pretext. Rather than searching the record for evidence to sustain this finding of fact that the reason was pretextual, the majority takes deBoer's pretextual reason at face value. It implies that Swenson was seeking an "exception" to deBoer's long-standing policy, and it finds that Swenson's "refusal to comply with deBoer's legitimate safety policy" was the reason deBoer refused to rehire him. *Id.*, ¶¶ 59, 61.

¶ 70. Having jettisoned the required analysis, the majority focuses its analysis on straw man diversions. It asserts: "An employer is not obligated to change its

long-standing and legitimate safety policies under the plain language of [Wis. Stat.] § 102.35(3) for the sake of assisting an employee meet his personal obligations." *Id.*, ¶ 50. It further contends that "LIRC, perhaps subconsciously, erroneously subsumed" the ch. 111 accommodation requirements for employees with disabilities, and that "LIRC's order that deBoer pay Swenson back pay cannot stand on LIRC's 'accommodation' rationale." *Id.*, ¶¶ 52–53.

## II

¶ 71. The employment-at-will doctrine generally permits an employer to discharge an at-will employee "for good cause, for no cause, or even for cause morally wrong." *Batteries Plus, LLC v. Mohr*, 2001 WI 80, ¶ 16, 244 Wis. 2d 559, 628 N.W.2d 364. Under Wisconsin's workers compensation statute, however, this calculus shifts when an employee has been injured on the job. An employer may be liable for up to one year of lost wages if it fails to demonstrate that it had reasonable cause to refuse to rehire an injured employee. Wis. Stat. § 102.35(3).

¶ 72. As the majority explains, "[a]n employer will fail to meet [its burden to show that it had reasonable cause to refuse to rehire the employee] if it is found that the alleged reason for the discharge was actually pretext . . . ." Majority op., ¶ 54 n.19. When the employer's asserted reason is found to be a pretext, it follows that the employer's asserted reason was not the actual reason that the employer refused to rehire the injured employee. Accordingly, a pretextual reason cannot be considered reasonable cause for refusal to rehire, and if the employer's asserted reason is found to be pretextual, the employer fails to meet its burden.

¶ 73. The determination of whether the purported reason given by the employer is a pretext is a finding of fact. *Id.*, ¶ 54 (citing *Ray Hutson Chevrolet, Inc. v. LIRC*, 186 Wis. 2d 118, 124, 519 N.W.2d 713 (Ct. App. 1994)). "When one or more inferences may be drawn from the evidence, the drawing of one of such permissible inferences by the commission is an act of fact-finding, and the inference is conclusive on the court." *Farmers Mill of Athens, Inc. v. DILHR*, 97 Wis. 2d 576, 580, 294 N.W.2d 39 (Ct. App. 1980).[1]

¶ 74. LIRC's findings of fact are given deference in great part because they are based on the administrative law judge's assessment of the credibility of the witnesses. Witness credibility is readily gauged by an examiner present at the hearing who can observe the witness's demeanor, mannerisms, tone of voice, and other visual and aural cues. It is less easily assessed by an appellate court's review of a cold transcript. Accordingly, "[t]his court does not weigh the evidence or pass upon the credibility of the witnesses; rather, the weight and credibility of evidence is to be determined by LIRC." *Ide v. LIRC*, 224 Wis. 2d 159, 165, 589 N.W.2d 363 (1999).

¶ 75. After hearing all of the evidence and evaluating the credibility of the witnesses, the administrative law judge found: "This was a case where one could infer that deBoer was not interested in keeping Mr. Swenson as an employee and used its policy on check-

---

[1] The workers compensation statute specifically provides that "[t]he findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive," Wis. Stat. § 102.23(1), and that "a court may set aside the commission's award if it "depends on any material and controverted finding of fact that is not supported by credible and substantial evidence." Wis. Stat. § 102.23(6).

rides as its reason[.]" LIRC "adopt[ed] the findings and order in that decision as its own."

¶ 76. On review, a court's role "is to search the record to locate credible evidence that supports LIRC's factual findings." *Ide,* 224 Wis. 2d at 165. Here, the majority either glosses over or ignores the substantial and credible evidence which supports the finding that deBoer's asserted business reason for refusing to rehire Swenson was pretextual.

¶ 77. DeBoer asserted that it terminated Swenson because he refused to go on a multi-day check-ride, as was mandated by deBoer's policy. It is notable, however, that deBoer has no written policy governing the duration of check-rides or setting forth any requirement that the check-ride constitute a multi-day trip. Rather, its written policy merely provides that returning drivers "complete a minimum of one trip" of unspecified duration:

> Drivers who are off work for any reason for more than 2 months are required to:
>
> 1. Complete orientation
>
> 2. Complete a minimum of one trip with another driver to regain the necessary skills that were not used while off work.

¶ 78. The record further reveals that Swenson was not informed that the check-ride would constitute a multi-day trip which would interfere with his caretaking obligations until the very day that deBoer had scheduled the check-ride to begin. Cindy Vogel, deBoer's workers compensation administrator, discussed the check-ride with Swenson on several occasions in the months prior to his reorientation. Nevertheless, Vogel never informed Swenson that the check-ride would constitute a multi-day trip.

¶ 79. Swenson was injured in August of 2005. Vogel testified that in November, she spoke with Swenson about the requirements for returning to work, but they did not discuss any details of the check-ride. She testified further that in December, she told Swenson "[t]hat he would go out with a trainer and then they would go [on] one trip is how I explained it to him, and that would give him the opportunity to reacquaint his skills and to ease back into actually driving the truck[.]" There is no indication that Vogel informed Swenson that the check-ride might constitute a multi-day trip.

¶ 80. On February 22, 2006, shortly before Swenson began reorientation, Vogel sent Swenson a letter that briefly listed the requirements he must fulfill prior to returning to work. The letter mentioned the check-ride requirement, but again, without setting forth any detail. It did not inform Swenson that any arrangements had been made for the check-ride. It did not provide any scheduled date, and again, it failed to inform Swenson that the check-ride could constitute a multi-day trip:

> Please note your Professional Driver work manual, drivers off work for more than 2 months are required to complete orientation, complete a minimum of one trip with another driver to regain the skills necessary to safely operate a commercial motor vehicle and pass DOT re-certification tests.
>
> The following arrangements have been made:
>
> Monday – February 27, 2006 3:15 pm DOT re-certification drug and physical Dragt Chiropractic/ Alliant Health, Marshfield WI. A map to their facility is enclosed.
>
> Tuesday – February 28, 2006 8:00 am Orientation, deBoer Blenker WI, check in at the reception desk and ask for Gerald.

¶ 81. It is clear from the record that it was not until the very day that Swenson was expected to leave on the check-ride that he was informed that it would constitute a multi-day trip lasting anywhere from a few days to two weeks. The record reveals that Swenson completed the reorientation on March 1. On that day, deBoer's safety director, Dan Garcia, first informed Swenson that a driver had been dispatched from Texas to take him on the check-ride, that he was expected to depart on the check-ride that very day, and that if he did not go he would be processed as a quit.

¶ 82. In an email documenting the incident, Garcia wrote: "Charles completed his re-orientation on 3/1/06. We had scheduled a driver trainer to pick him up on that same day to take him out for his 'check ride' to ensure safety. . . . I informed Charles that he would have to do this and he flat out refused to go."

¶ 83. On March 2, within one day of Swenson's refusal, Garcia sent the following email: "Charles has refused to go with a trainer to perform his required check ride upon returning to work. Due to his refusal, he will be processed as a quit effective immediately."

¶ 84. Given this timeline of events set forth above, a reasonable person could infer that deBoer had not implemented its check-ride policy in good faith. A reasonable person might wonder why deBoer had the time and foresight to dispatch a driver from Texas to arrive on March 1, but did not have the foresight to give Swenson any advance notice of the start date or duration of the trip.

¶ 85. There is evidence in the record to support an inference that deBoer knew about Swenson's caretaking responsibilities. When deBoer first acquired the trucking business in August of 2005, it gave Swenson a short survey, explaining that "[t]his survey will be used

to help deBoer Transportation, Inc., meet your needs." Swenson wrote: "I have to be home from 3:00 p.m. to midnite Mon. [through] Thurs. and by 1 p.m. on Fri. to take care of my father[.]" Swenson filled out an identical survey on February 28, 2006, the day before deBoer fired him. Swenson wrote: "I take care of my dad; he has spinal cancer. I need to be home at nite to take care of him."

¶ 86. A reasonable person could infer that deBoer knew that Swenson would be unable to drop everything to go on a check-ride for an indeterminate duration with no advance notice, and that it had engineered the details in a way that would force Swenson's refusal. LIRC's finding of fact is supported by substantial and credible evidence, and it should be upheld.

III

¶ 87. Rather than searching the record to locate the substantial and credible evidence that supports LIRC's finding of fact, the majority engages in diversion. It warps the facts and the agency's decision in an attempt to convert the inquiry into a question of law.

¶ 88. The majority begins by implying that Swenson was seeking an exception from the check-ride policy. *See* majority op., ¶¶ 59, 61. Yet, this implication is contrary to LIRC's finding of fact. In reliance on the administrative law judge's findings, LIRC determined that Swenson "intended to do the check-ride" and that he "was not asking deBoer for an exception to the policy requiring it."

¶ 89. Next, the majority sets up a straw man to knock down. It contends, "[a]n employer is not obligated to change its long-standing and legitimate safety policies under the plain language of [Wis. Stat.]

§ 102.35(3) for the sake of assisting an employee meet his personal obligations." Majority op., ¶ 50. This assertion may be accurate—but it misses the mark.

¶ 90. If deBoer was using its long-standing policy as a pretext for refusing to rehire Swenson, then Swenson's refusal to go on the check-ride was not the actual reason that deBoer refused to rehire him. DeBoer's pretextual reason for terminating Swenson cannot constitute reasonable cause.

¶ 91. Finally, the majority erects and then swings at yet another straw man. Wisconsin Stat. § 111.34 provides that employment discrimination includes "[r]efusing to reasonably accommodate an employee's or prospective employee's disability[.]" The majority seizes on the fact that LIRC used the word "accommodation" when it affirmed the administrative law judge's decision. It contends that LIRC "perhaps subconsciously, erroneously subsumed" the ch. 111 accommodation requirements for employees with disabilities, and that "LIRC's order that deBoer pay Swenson back pay cannot stand on LIRC's 'accommodation' rationale." Majority op., ¶¶ 52–53.

¶ 92. The majority misconstrues LIRC's analysis. To support its determination that the check-ride policy was pretext, the administrative law judge relied on the fact that "alternatives were not explored" and that Garcia "took a blind approach to this policy and for them that was the end of it."[2] LIRC agreed. It explained: "The simple accommodation [Swenson] requested for

---

[2] The administrative law judge explained: "[Swenson] was asking if some alternative arrangement could be made for the check-ride. As best as one can tell from the testimony of the two deBoer witnesses, alternatives were not explored. They took a blind approach to this policy and for them that was the end of it."

the testing process was reasonable, and it would not have jeopardized any of the employer's safety concerns. . . . [T]he employer gave no explanation for failing to even consider this request."

¶ 93. LIRC made no reference to Wis. Stat. ch. 111, and its use of the word "accommodation" cannot reasonably be interpreted as a reference to the chapter 111 requirements for accommodating employees with disabilities. Rather, LIRC appeared to have used the word "accommodation" in the colloquial sense. The fact that deBoer took a "blind approach" and that "alternatives were not explored" strengthened the inference that "deBoer was not interested in keeping Mr. Swenson as an employee and used its policy on check-rides as its reason."

¶ 94. Once the majority's diversions are cast aside, the proper analysis is straightforward. Swenson made a prima facie case that deBoer unreasonably refused to rehire him. As demonstrated above, LIRC found that deBoer's asserted reason was pretext, and that finding is supported by substantial and credible evidence. Because I would uphold LIRC's decision, I respectfully dissent.

¶ 95. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.